[Cite as *State v. Freeze*, 2012-Ohio-5840.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | CASE NO. CA2011-11-209 |
| Plaintiff-Appellee, | : | |
| | : | O P I N I O N<br>12/10/2012 |
| - vs - | : | |
| | : | |
| BRYAN S. FREEZE, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2011-05-0708

Michael T. Gmoser, Butler County Prosecuting Attorney, Lina N. Alkamhawi, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Charles Conliff, 5145 Pleasant Avenue, Suite 18, P.O. Box 18424, Fairfield, Ohio 45018-0424, for defendant-appellant

**S. POWELL, P.J.**

{¶ 1} Defendant-appellant, Bryan S. Freeze, appeals his conviction in the Butler County Court of Common Pleas for seven counts of robbery. For the reasons stated below, we affirm.

{¶ 2} From October 2010 until early January 2011, a string of robberies were committed in the Middletown and West Chester area. The robberies occurred at several

small businesses, including a local BP Drive-Thru, Waffle House, Great Clips, Dillman's Grocery, Jimmy John's, and Advanced Auto-Parts. Appellant and Wesley Moore became suspects in these robberies.

{¶ 3} Appellant was indicted for seven robberies, in violation of R.C. 2911.02(A)(2) and seven repeat violent offender specifications under R.C. 2941.149. Appellant pled not guilty to the charges, and the matters proceeded to a jury trial. At trial, several witnesses, including Moore, testified regarding the seven robberies.

{¶ 4} At trial, Moore testified that he and appellant worked together to rob several businesses in the Butler County area. Moore explained that he met appellant in prison and they became cell-mates in 2003. In 2009 Moore was released from prison and returned to his hometown of Columbus, Ohio. Moore maintained contact with appellant who was still in prison. After appellant was released from prison, appellant would pick up Moore from Columbus and the two would return to appellant's apartment in Middletown. During these visits, appellant and Moore robbed several businesses. Moore testified that appellant would always choose the locations because he was familiar with the area.

## BP Drive-Thru

{¶ 5} The first of the seven indicted robberies was the robbery of the BP Drive-Thru. On October 4, 2010, and again on November 12, 2010, the BP Drive-Thru in Middletown was robbed. Moore stated that appellant chose the Drive-Thru as a target to rob and drove through the Drive-Thru prior to the robbery to scope it out. On the evenings of October 4 and November 12, appellant drove Moore to a residential street close to the Drive-Thru and waited for Moore to return from the robbery. Moore stated that he used a fake plastic rifle made to look like a sawed-off shotgun with duct tape on the handle and that he did not wear a mask. Moore then walked into the Drive-Thru with the gun, obtained the money, returned to appellant and the getaway car, and spilt the money with appellant.

{¶ 6}   Middletown Detective Richard Bush also testified regarding the BP Drive-Thru robberies.  He stated that he was investigating a series of robberies that had occurred in Middletown and began scrutinizing the robberies at the BP Drive-Thru because they fit the same modus operandi as the other robberies.  The BP Drive-Thru had a digital recording system and Bush was able to obtain surveillance video from October 4, 2010, and November 12, 2010, which captured the two robberies.  This video was introduced at trial and showed a man wearing a leather jacket entering the Drive-Thru with a shot gun.  Both Bush and Moore identified the robber in the video as Moore.

## Waffle House

{¶ 7}   The next robbery to occur was at the Waffle House on October 5, 2010.  The Waffle House is located in West Chester and was robbed between 12:30 a.m. and 1:30 a.m. A Waffle House manager and customer who were present during the robbery testified regarding the incident.  Both the manager and customer stated that two men, one wearing a bandana and one unmasked, entered the restaurant in the early morning hours of October 5, 2010.  The manager testified that the two men ordered some of the employees and the customers into the men's restrooms.  The men then ordered the manager to open the cash registers and the safes.  The masked man had a gun and kept pushing the manager with the gun.  The masked man also hit the manager in the head with the gun.  The manager was unable to open the safe but gave the men the money inside the cash registers.

{¶ 8}   Both the manager and the customer described the bandana one of the men was wearing as checkered; the manager stated it had a red and blue pattern while the customer described it as red and black.  The manager identified appellant as the robber with the bandana. The manager stated that he looked straight into the masked man's eyes when the man was pointing a gun at him and could identify the man as appellant.  The manager described the gun as a "shotgun" and believed it to be real.  The customer also commented

that the masked man had a single-action shotgun, which "at first didn't seem real." The customer stated that the masked man had peppered gray hair but was unable to identify the masked man at trial.

{¶ 9} Moore also admitted to robbing the Waffle House with appellant. He stated that appellant chose the Waffle House as a target. During the robbery, Moore, unmasked, entered the restaurant first with appellant following closely behind. Moore stated that he always committed the robberies without a mask so he could get into the business without causing alarm. Moore reasoned that he did not need to wear a mask because he was not from the area, so people wouldn't recognize him. Appellant took a shirt out of the backseat and tied it around his face. Appellant also carried a fake air compressor pistol that was black into the restaurant. After the men entered the business, Moore took the money out of the register and the two fled the scene.

### Great Clips

{¶ 10} Great Clips, located in West Chester, was the next business to be robbed on October 14, 2010. Two employees, working at the time the robbery occurred, testified regarding the incident. An unmasked man entered the business around 8:40 p.m. and asked if he could get a haircut. The man then revealed a gun and told the employee to give him the money. One employee described the gun as silver with a long handle and it appeared to be real. Both employees were unable to identify appellant as the man who robbed them.

{¶ 11} Moore testified regarding the incident and stated that he went into the business alone, unmasked to rob it. Appellant again picked the business as a target to rob. Appellant was the getaway driver and parked behind the building so that Moore could go out the back door of Great Clips and run straight into the car. Moore used a fake air compressor pistol that was black and looked like it could be a 9 mm handgun. Moore stated that he and appellant spilt the money between them.

**Dillman's Grocery**

{¶ 12} A manager and an employee from Dillman's Grocery testified at trial that their store was robbed on December 19, 2010. Dillman's Grocery is located in Middletown. The manager of the grocery store stated that at 7:45 p.m. two men came into the business with guns and took several thousand dollars. One of the men was masked and the other man did not wear a mask. The unmasked man emptied the manager's register. The employee testified that the masked man told her to empty the cash register and threatened to shoot the employee in the stomach when she could not get it open. Eventually, the employee opened the register and the masked man took its contents. Additionally, the masked man ordered the manager to empty the store's safe. The state introduced two exhibits at trial, a black ski mask and a fake air compressor pistol. Police found the mask and the air compressor pistol during a search of appellant's vehicle. Both witnesses identified these exhibits as similar to the gun and mask that were used in the robbery.

{¶ 13} Moore also recalled robbing a grocery store, with the name of "Dollman's or something like that." Appellant again chose this location and both men went into the store. Moore stated that he did not wear a mask and appellant wore a black ski mask. The men carried "little pellet pistols" similar to the one that was identified by the Dillman employees. Moore testified that when they went in, three female employees were working. They emptied the cash registers and the safe. During the robbery, Moore stated that appellant "told one lady to stay still and had words with her" and they pointed the guns at the clerks "the whole time pretty much." The two men divided the money between them.

**Jimmy John's**

{¶ 14} After the Dillman's Grocery robbery, a West Chester Jimmy John's restaurant was robbed on January 8, 2011. Two Jimmy John's employees testified regarding the robbery. One employee explained that on January 8, around 9 p.m., he and another

employee were cleaning up the store. Suddenly, two men, one masked and one unmasked, entered the store and ordered the employees to turn over the money. The employees did not have a key to the register, so they took the men to the back of the store where the manager opened the safe. After the men emptied the contents of the safe, they ordered the employees to "get on the ground and don't move." Initially, the men had trouble exiting the restaurant and returned to ask the employees where the back door was located. The men then left.

{¶ 15} One of the employees described the unmasked man as carrying a gun and stated that this man was not appellant. The other robber was wearing a black mask, similar to the state's exhibit. The masked man was carrying a gun and the employee described it as a small black pistol, semi-automatic. The employee was unable to identify the masked man as appellant because he was unable to see his face. The second employee was also unable to identify the masked man as appellant.

{¶ 16} A West Chester Police Officer testified regarding his investigation of the Jimmy John's robbery. The officer was dispatched to Jimmy John's shortly after the robbery occurred. The officer found no physical evidence at the scene. However, the officer reviewed the Jimmy John's security video and, based on his observations, confirmed that it appeared to be a robbery. The officer did not copy the video but instead made several stills which were introduced at trial. The officer was unable to identify appellant as a suspect in the robbery.

{¶ 17} Finally, Moore testified regarding the Jimmy John's robbery. He stated that both he and appellant went into the restaurant. Appellant was wearing a black ski mask while he was unmasked and both men had fake guns, similar to the ones in the state's exhibit. Moore identified appellant from one of the still photographs taken from the security video. Moore stated that he went towards the back and emptied the safe. The men then

exited the building through the back and drove away in appellant's car. They spilt the money between them.

### Advanced Auto Parts

{¶ 18} The last indicted robbery occurred on January 16, 2011, at Advanced Auto Parts in Middletown. Two employees were working when a white male came through the store's front door at approximately 10:20 a.m. One of the employees was in the front part of the store and the other was in the back room. The white male pulled a gun, and told the employee to empty the registers. A second man wearing a black ski mask came in a few seconds after the first man. After the second man entered the store, the employee in the back room came out and found that all the registers were open. The masked man pointed a gun to the employee's head and the employee testified that he heard a "click-click" which sounded like a gun cock. The unmasked robber ordered the employees to open the safe. An employee responded that he could not open the safe as it was on a time delay. The robbers then left the store.

{¶ 19} Both employees described the guns used by the men as black. One testified that the gun was a "smooth cylinder type on the top, real narrowish, possibly nine millimeter." The second employee described the gun as a black semi-automatic. Both employees identified the guns used in the robbery as similar in color, size, and style to the gun in the state's exhibit. Both employees described the mask the second man was wearing as a black ski mask and stated that the state's exhibit of a ski mask matched the robber's mask. The employees were not able to identify appellant as the masked man.

{¶ 20} A Middletown detective testified that he recovered a surveillance video from a business that is located southeast from Advanced Auto Parts. The two businesses share an alleyway. The video contained a time and date stamp. In the video, on January 16, 2011, around 10:10 a.m., an orange-colored Pontiac Sunfire is seen heading towards Advanced

Auto Parts and a few minutes later, the same car heads eastbound away from Advanced Auto Parts. The car then appears 15 minutes later and it turns off into an alley behind Advanced Auto Parts and parks behind a dumpster out of view of the auto parts store. The car is then seen again around 10:32 a.m. Appellant owns an orange Pontiac Sunfire.

{¶ 21} Lastly, Moore testified regarding the robbery of the auto parts store. Moore, who is a white male, stated that the Advanced Auto Parts robbery was the first robbery the pair committed in the daylight. He and appellant circled around the store for a while trying to decide on a plan. The men then parked along the side of the store and Moore entered the building first with appellant following close behind. Moore did not cover his face while appellant wore a black ski mask. Moore explained that he told one of the employees to empty the registers and appellant held a gun to the other employee's head. Moore and appellant were unable to remove the money in the safe as it was on a time delay. Moore identified the black ski mask and guns offered by the state as the guns and mask they used during the robbery. Moore acknowledged that the guns used in the robbery were fake and would be unable to make a "gun-cocking" sound. Additionally, Moore stated that they always used appellant's orange Pontiac Sunfire for the robberies and Moore identified the vehicle in the surveillance video. The men spilt the money between them.

<u>**Batteries Plus and Hotel Robberies**</u>

{¶ 22} Moore also testified about other unindicted robberies. Moore and appellant committed two or three other robberies at local area hotels. Moore stated that he went into the hotels alone and robbed them. Appellant acted as the lookout man in the vehicle and drove the pair away when Moore finished the robbery. The pair then spilt the money.

{¶ 23} Another unindicted robbery, the robbery of a Batteries Plus store in Liberty Township, led to the arrest of appellant and Moore. On January 18, 2011, Moore and appellant were driving around looking for a location to rob. The men decided to rob Batteries

Plus because of its location close to a highway. Moore testified that he and appellant walked inside the store and ordered the employees to empty their cash registers. Appellant was wearing a black ski mask and used a fake gun similar to those used in the other robberies. During the robbery, Moore noticed a person sitting in an SUV outside the store. The men quickly left the store and drove away in appellant's orange Pontiac Sunfire.

{¶ 24} The Butler County Sheriff's Office was notified of the robbery and responded to the scene. During the investigation of the robbery, a witness was identified who had recorded the license plate number of the robber's vehicle. The license plate number led the police to appellant's apartment. When appellant returned to his apartment, the police were waiting for him. Appellant was arrested and he identified Moore as assisting him in the Batteries Plus robbery. Police obtained a search warrant for appellant's vehicle and found an empty money bag which contained a deposit receipt from Batteries Plus. Additionally, police found a fake firearm in the driver's side rear seat area and a black ski mask. Moore was convicted of this robbery.

{¶ 25} After the presentation of all the witnesses, a unanimous jury found appellant guilty of seven counts of robbery. The trial court then found appellant guilty of seven repeat violent offender specifications. Appellant was sentenced to an aggregate prison term of 16 years.

{¶ 26} Appellant now appeals, raising seven assignments of error.

{¶ 27} Assignment of Error No. 1:

{¶ 28} APPELLANT'S RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE MISJOINDER OF UNRELATED CRIMINAL OFFENSES.

{¶ 29} Appellant argues that the trial court committed plain error by joining the seven counts of robbery into one trial.

{¶ 30} Ordinarily, we review a trial court's decision regarding joinder under an abuse of

discretion standard. *State v. Moshos*, 12th Dist. No. CA2009-06-008, 2010-Ohio-735. However, in this case we will review for plain error as appellant failed to file a motion to sever the cases. *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ 108; Crim.R. 52(B). An alleged error is plain error only if the error is "obvious" and "but for the error, the outcome of the trial clearly would have been otherwise." *Lang* at ¶ 108. Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *Id.*

{¶ 31} It is well-established that "[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *State v. Lott*, 51 Ohio St.3d 160, 163 (1990), quoting *State v. Torres*, 66 Ohio St.2d 340 (1981). "Joinder is liberally permitted to conserve judicial resources, reduce the chance of incongruous results in successive trials, and diminish inconvenience to the witnesses." *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992). However, a defendant may move to sever offenses that have otherwise been properly joined where it appears that joinder would be prejudicial. *Id.*; Crim.R. 14. The defendant bears the burden of proving prejudicial joinder. *State v. Ashcraft*, 12th Dist. No. CA2008-12-305, 2009-Ohio-5281, ¶ 15*.*

{¶ 32} The state may rebut a defendant's claim of prejudice by utilizing one of two methods. *Id.* at ¶ 16. The "other acts" test allows the state to rebut the defendant's claim of prejudice by demonstrating that it could have introduced evidence of the joined offenses at separate trials pursuant to the "other acts" provision found in Evid.R. 404(B). *State v. Coley*, 93 Ohio St.3d 253, 259 (2001). "If the evidence of other crimes would be admissible at separate trials, any prejudice that might result from the jury's hearing the evidence of the other crime in a joint trial would be no different from that possible in separate trials, and a court need not inquire further." *State v. Garrett*, 12th Dist. No. CA2008-08-075, 2009-Ohio-5442, ¶ 42. On the other hand, the state may separately negate a claim of prejudice by

satisfying the less stringent "joinder test," which requires the state to merely demonstrate "that evidence of each crime joined at trial is simple and direct." *Coley* at 260.

{¶ 33} Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, "other acts" evidence is admissible for other purposes, such as to establish the identity of a perpetrator. *State v. Broom*, 40 Ohio St.3d 277, 282-283 (1988). Other-acts evidence is construed against admissibility because of the substantial danger that the jury will convict the defendant solely because it assumed that the defendant has a propensity to commit crimes and not based on whether the defendant committed the crime charged in the indictment. *State v. Lowe*, 69 Ohio St.3d 527, 530 (1994). The admission of other acts evidence must also meet the prerequisites of Evid.R. 403(A), which requires the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *State v. Vore*, 12th Dist. No. CA2011-08-093, 2012-Ohio-2431.

{¶ 34} One of the purposes in which other acts evidence is admissible, is to establish the identity of the perpetrator. *Lowe* at 531. Other acts evidence is admissible where the identity of a perpetrator is established by showing he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense. *Id.* "To be admissible to prove identity through a certain *modus operandi*, other-acts evidence must be related to and share common features with the crime in question." *Id.* at paragraph one of the syllabus.

{¶ 35} In the present case, the seven robberies appellant was charged with shared many common features. All of the seven robberies occurred in a short time frame, between October 4, 2010, and January 16, 2011. The robberies were all concentrated geographically, as they occurred in either Middletown or West Chester. In all instances when two men went

inside to commit the robbery, one man was always masked and the other man was not. Moore testified that appellant always wore a mask during the robberies because appellant was from the area. In the three robberies that appellant is alleged to have been the getaway driver, the single man that robbed the business was never wearing a mask.

{¶ 36} Further, the style of all of the robberies was similar. The robberies all occurred when the businesses were open. Besides threats and an incident in which a victim was hit in the head with a gun, the robberies were all relatively non-violent. Moore testified that in all of the robberies, fake guns were used that were either fake air compressor pistols or a plastic sawed off shotgun. Also, all of the indicted robberies except the Advanced Auto Parts robbery occurred during the evening hours while it was dark. Thus, due to the similarities of the robberies, we find that the evidence of these robberies would have been admissible to establish the identity of the perpetrator in separate trials pursuant to Evid.R. 404(B).

{¶ 37} Additionally, the record demonstrates that the trial court instructed the jury that it was required to consider the charges as separate matters. The trial court explained, "[e]ach offense is a separate and distinct matter. You must consider each count and the evidence applicable to it separately, and you must state your findings as to each count uninfluenced by your verdict as to any other count." The court also instructed the jury regarding the proper consideration of other acts evidence, "if you believe that the defendant was involved in other robberies, other bad acts, other wrongdoing * * * you cannot use that belief to say well, he's a bad character and so because I think he had bad character he committed these seven alleged robberies * * * however, be admissible for other purposes, such as * * * identity * * *."

{¶ 38} As this court has previously stated, a jury is presumed to have followed the trial court's instructions. *Ashcraft*, 12th Dist. No. CA2008-12-305, 2009-Ohio-5281 at ¶ 26. The record in this case does not indicate that the jury disregarded the trial court's instructions or

demonstrated confusion concerning the offenses and evidence presented.

**{¶ 39}** Therefore, we find that plain error did not exist in joining the offenses because evidence of the joined offenses could have been admitted at separate trials pursuant to Evid.R. 404(B). Appellant's first assignment of error is overruled.

**{¶ 40}** Assignment of Error No. 2:

**{¶ 41}** APPELLANT'S RIGHT TO A FAIR TRIAL WAS VIOLATED BY THE ADMISSION OF 404(B) EVIDENCE.

**{¶ 42}** Appellant argues in his second assignment of error that the trial court violated Evid.R. 404(B) by admitting evidence of appellant's "prior bad acts." Appellant contends the court erred in two ways. First, the court erred by allowing the jury to consider the indicted robberies as evidence of identity for each of the individual robberies. Second, the court erred when it admitted evidence of a prior criminal conviction and uncharged robberies.

**{¶ 43}** We begin by noting the standard of review. In general, we will not reverse a trial court's decision regarding the admission of evidence absent an abuse of discretion. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, ¶ 96. However, when a party fails to object to the issue now appealed, we review for plain error. Crim.R. 52; *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215 at ¶ 108. Additionally, when a party files a motion in limine regarding the exclusion of evidence but fails to timely object at trial, this court will review the admission of such evidence under a plain error analysis. *Vore*, 12th Dist. No. CA2011-08-093, 2012-Ohio-2431 at ¶ 37, citing *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 133. The court will conduct a plain error analysis because a motion in limine is a tentative, interlocutory, precautionary ruling by the trial court reflecting its anticipatory treatment of the evidentiary issue. *State v. Grubb*, 28 Ohio St.3d 199, 201-202 (1986). A "motion in limine" is defined as a "pretrial request that certain inadmissible evidence not be referred to or offered at trial." *Black's Law Dictionary* (9th Ed.2009).

**{¶ 44}** Before trial, appellant filed a motion in opposition to the state's motion "to permit evidence of other acts pursuant to Evidence Rule 404(B)." Appellant argued that this "other acts" evidence should be excluded as it was improper character evidence. The court granted the state's motion to allow evidence of other acts and during trial, appellant did not object to the admission of this evidence. Therefore, we will review the admission of this evidence under a plain error analysis as appellant did not object during trial and appellant's motion did not preserve the issue for appeal.

**{¶ 45}** As stated in the first assignment of error, evidence of other crimes, wrongs, or acts is not admissible to show the accused's character or his criminal propensity but is admissible to establish the identity of the perpetrator. Evid.R. 404(B); *Broom*, 40 Ohio St.3d at 282-283. *See* R.C. 2945.59. The admission of other acts evidence is construed against admissibility and must satisfy the requirements of Evid.R. 403(A). *Vore* at ¶ 40. Other acts evidence may be introduced under Evid.R. 404(B) to establish the identity of a perpetrator by showing that he has committed similar crimes and that a distinct, identifiable scheme, plan, or system was used in the commission of the charged offense. *Lowe*, 69 Ohio St.3d at 530.

**{¶ 46}** Initially, we note that appellant's first argument is without merit. As discussed in the first assignment of error, evidence of the seven indicted offenses was proper 404(B) evidence. These offenses established the identity of the masked robber. The seven indicted robberies shared many similarities, such as occurring within a short time frame, in the same geographical area, and all either having two men, one of whom was masked, or a single unmasked man. Therefore, the trial court did not err in allowing the jury to consider the indicted offenses in every charge for the limited purpose of identity.

**{¶ 47}** Appellant's second argument is that the trial court erred when it admitted evidence of two hotel robberies appellant and Moore allegedly performed as well as the Batteries Plus robbery. All of these robberies were not at issue at trial. Moore testified that

he and appellant robbed a couple of hotels. He stated that it was the same plan as the other robberies where appellant did not go into the business. Appellant would drive to the location and wait while Moore would perform the robbery. Additionally, the state introduced evidence regarding the last robbery appellant and Moore committed at Batteries Plus. Moore explained that this robbery was similar to the others in that he and appellant drove around looking for a good location to rob, both he and appellant performed the robbery, they used fake guns, and appellant wore a black ski mask while Moore was unmasked. This robbery occurred in the same geographic location and time frame as the others and was also a non-violent robbery. Ultimately, police linked appellant with the Batteries Plus robbery and found a black ski mask and a fake gun in appellant's vehicle.

{¶ 48} We find that the trial court did not commit plain error in admitting evidence of the hotel and Batteries Plus robberies. The main issue in this case was the identity of the second man in the robberies, as this individual always wore a mask or stayed in the vehicle as the getaway driver. The evidence of the hotel and Batteries Plus robberies helped establish that appellant was the second individual involved in the crimes as these robberies shared many common features. The Batteries Plus robbery was relevant to show identity for the remainder of the robberies because the robbery occurred in the same geographic location and time frame as the others, appellant wore a black ski mask, fake guns were used, the robbery was performed by two men while the business was open, and the robbery was relatively non-violent. The hotel robberies were relevant to show a common scheme for the robberies that were committed by only one individual as appellant was the getaway driver and Moore went inside the business and robbed it alone.

{¶ 49} Lastly, as discussed in the first assignment of error, the trial court instructed the jury that it was required to consider the charges as separate matters and instructed the jury regarding the proper consideration of other acts evidence. The jury is presumed to follow the

trial court's instructions. *Ashcraft*, 12th Dist. No. CA2008-12-305, 2009-Ohio-5281 at ¶ 26. Moreover, nothing suggests that the jury used the evidence presented by the state to convict appellant on the theory he was a bad person or had a propensity toward crime.

{¶ 50} Thus, the trial court did not commit plain error in allowing evidence of appellant's other acts pursuant to Evid.R. 404(B) as these acts were helpful in establishing identity. Appellant's second assignment of error is overruled.

{¶ 51} Assignment of Error No. 3:

{¶ 52} APPELLANT'S RIGHT TO A FAIR TRIAL WAS VIOLATED BECAUSE THE TRIAL COURT ALLOWED THE TESTIMONY OF AN INCOMPETENT WITNESS.

{¶ 53} Appellant argues the trial court committed plain error by permitting Moore to testify because he was an incompetent witness. Specifically, appellant contends the trial court erred when it did not sua sponte voir dire Moore as to his competency because he is diagnosed as a schizophrenic, was abusing drugs at the time of the robberies, and didn't remember some aspects of the robberies.

{¶ 54} Ordinarily, we review a court's competency determination under an abuse of discretion standard. *State v. Alkire*, 12th Dist. No. CA2008-09-023, 2009-Ohio-2813, ¶ 26. Because appellant failed to object to Moore's testimony on the basis of competency or request the court to voir dire Moore, we will review this claim for plain error. *State v. Laws*, 12th Dist. No. CA87-12-097 (July 18, 1988); *State v. Jackson*, 8th Dist. No. 79871, 2002-Ohio-2137. As stated in the first assignment of error, an alleged error is plain error only if it is "obvious" and "but for the error, the outcome of the trial clearly would have been otherwise." *Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, ¶ at 108; Crim.R. 52(B).

{¶ 55} According to Evid.R. 601(A) and R.C. 2317.01, "all persons are competent witnesses except those of unsound mind and children under ten years of age who appear incapable of receiving just impressions of the facts and transactions respecting which they

- 16 -

are examined, or of relating them truthfully." In order for the trial court to have a sua sponte duty to inquire into a witness's competency, that competency must have been clearly called into question by the time the witness was called to the stand. *State v. Cooper*, 139 Ohio App.3d 149 (12th Dist.2000), citing *State v. Kinney*, 35 Ohio App.3d 84, 85-86 (1st Dist.1987).

{¶ 56} It is prima facie evidence of unsoundness of mind if a person has been found to be insane or is an inmate of an insane asylum. *State v. Wildman*, 145 Ohio St. 379, 384 (1945). However, witnesses who suffer from emotional or psychological illness are not per se incompetent to testify. *State v. Gates*, 8th Dist. No. 75229, 2001 WL 259184, *4 (March 15, 2001). The Ohio Supreme Court has noted that a person who suffers from "some unsoundness of mind" can still be competent to testify if he "is able to correctly state matters which have come within his perception with respect to the issues involved and appreciates and understands the nature and obligation of an oath." *Wildman* at paragraph three of the syllabus. The Seventh District found that a witness who suffered from bipolar disorder and another witness who was stressed and depressed were not incompetent to testify because they were capable of correctly stating matters which they perceived and did not have difficulty understanding the nature and obligation of an oath. *Gates* at *5. Additionally, a witness who suffered from schizophrenia but was living and working on his own without substantial medication for his illness was not "unsound of mind" sufficient to require the trial court to sua sponte conduct a void dire examination of the witness. *Jackson* at ¶ 18.

{¶ 57} At trial, Moore testified that he suffers from borderline schizophrenia. He stated that he currently only takes anxiety medication as he no longer needs medication for his mental illness. Moore stated that his mental illness did not hinder his ability to testify truthfully at trial. Additionally, Moore admitted that he was addicted to heroin and cocaine during the crimes. However, he testified that he was sober at the time of the trial and no

longer has a substance abuse problem. Moore also acknowledged that it would be hard for him to put all the robberies in order although he can remember the basics of all the robberies.

{¶ 58} Upon a thorough review of the record, we find that Moore was a competent witness and the trial court did not err in failing to voir dire Moore. There was no evidence that Moore was insane or an inmate of an insane asylum. While Moore suffers from borderline schizophrenia, he testified that he is not prescribed any medication for his mental illness and only takes medicine to manage his anxiety. Consequently, this case is similar to *Jackson* and *Gates*, because Moore suffered from a mental illness but that illness did not affect his ability to receive just impression of facts and relate them truthfully.

{¶ 59} Further, the testimony at trial established that Moore's substance abuse addiction at the time of the offenses did not render him incompetent. Although Moore stated that he was under the influence of heroin and cocaine at the time of the robberies, he indicated that he was sober at trial and recalled several specifics of the robberies. The record shows over 100 pages of testimony from Moore recalling the locations of the robberies, the time of day when each occurred, whether he performed the robbery himself or had assistance from appellant, and other details. Although he stated that he could not remember every robbery perfectly, his memory of the robberies was largely consistent with the other witnesses at trial. Lastly, there was no indication that Moore was unable to understand the importance of an oath. Thus, we find that Moore was a competent witness. Moore's use of drugs during the robberies and his memory of the incidents affects the credibility of his testimony, not its admissibility.

{¶ 60} Thus, we find that the trial court did not err in failing to voir dire Moore regarding his competency to testify. Appellant's third assignment of error is overruled.

{¶ 61} Assignment of Error No. 4:

{¶ 62} APPELLANT'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL WAS VIOLATED

WHEN THE COURT ADMITTED EVIDENCE WHICH WAS IMPROPERLY AUTHENTICATED.

{¶ 63} In appellant's fourth assignment of error, he argues the trial court erred when it admitted evidence which was improperly authenticated. Appellant challenges three groups of exhibits: a still photograph taken from a security camera at Jimmy John's, BP Drive-Thru surveillance videos, and a surveillance video and still photographs of the outside of Advanced Auto Parts.[1] Specifically, appellant argues that the exhibits with time and date stamps were improperly authenticated because the individual who created the video did not testify regarding the accuracy of this stamp.

{¶ 64} In general, the "trial court's decision to admit or exclude evidence will not be reversed by a reviewing court absent an abuse of discretion." *State v. Jackson*, 12th Dist. No. CA2011-01-001, 2011-Ohio-5593, ¶ 16. An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 130.

{¶ 65} The requirement of authentication or identification as a condition precedent to admissibility is satisfied by introducing "evidence sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A); *Moshos*, 12th Dist. No. CA2009-06-008, 2010-Ohio-735 at ¶ 11. This threshold requirement for authentication of evidence is low and does not require conclusive proof of authenticity. *State v. Easter*, 75 Ohio App.3d 22, 25 (4th Dist.1991). Instead, the state only needs to demonstrate a "reasonable likelihood" that the evidence is authentic. *State v. Thomas*, 12th Dist. No. CA2010-10-099, 2012-Ohio-2430, ¶ 15.

{¶ 66} Photographic and video evidence is generally authenticated in two ways. A

---

1. These exhibits were designated as state's exhibits 9-11 and 16-20 at trial.

person with knowledge to state that the photograph represents a fair and accurate depiction of the actual item at the time the picture was taken may authenticate the evidence. Evid.R. 901(B)(1); *State v. Penwell*, 12th Dist. No. CA2010-08-019, 2011-Ohio-2100. In authenticating evidence through this method, there is no need to call the witness who took the photographs as long as a witness with knowledge can testify that the photograph is a fair and accurate depiction. *State v. Combs*, 2d Dist. No. 22712, 2009-Ohio-1943; *State v. Mick*, 12th Dist. No. CA2011-08-017, 2012-Ohio-1598.

{¶ 67} An additional way to authenticate photographic evidence is under the "silent witness" theory. *Midland Steel Prods. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121 (1991). Under the silent witness theory, "the photographic evidence is a 'silent witness' which speaks for itself, and is substantive evidence of what it portrays independent of a sponsoring witness." *Id.* at 130. Therefore, photographic evidence may be admitted upon a sufficient showing of the reliability of the process or system that produced the evidence." *Id.* Expert witness testimony is not required to demonstrate reliability. *Id.* In *Midland*, the Ohio Supreme Court found that a surveillance video tape was properly authenticated when a witness's testimony regarding the layout of the area corresponded with the video and the witness was the custodian of the video and testified that the video had not been altered. *Id.*

{¶ 68} We will begin by addressing whether the first group of exhibits, a still photograph taken from a Jimmy John's security camera, was properly authenticated. At trial, a West Chester police officer testified that he investigated the robbery at Jimmy John's and viewed a security camera which recorded the robbery. A still photograph was then made of the video and introduced at trial. The photograph showed the masked individual during the robbery. The officer testified that he recognized the still photograph from the security camera video. Further, an employee of Jimmy John's who was present at the time of the robbery testified that the photograph was a "true and accurate" representation of the masked

individual the night of the robbery. Thus, we find this exhibit was properly admitted as two persons with knowledge testified that the photograph was accurate.

{¶ 69} Next, we discuss whether the second group of exhibits, the surveillance videos of the BP Drive-Thru robberies, were properly authenticated. Middletown Detective Richard Bush testified that he investigated both robberies at the Drive-Thru. Bush viewed footage of the robberies that was recorded by the Drive-Thru's digital recording system, pulled and stored the video on a "thumb drive," and then made a CD of the footage stored on the "thumb drive." At trial, the state introduced this CD as an exhibit and Bush confirmed that this CD was an accurate depiction of what he saw on the original footage. Additionally, Moore testified regarding these exhibits and identified the Drive-Thru and himself in the video. Thus, we find that the second group of exhibits was properly authenticated and the court did not abuse its discretion in admitting these exhibits.

{¶ 70} Lastly, we address the third group of exhibits concerning the Advanced Auto Parts robbery. Middletown Detective Ken Rogers testified that he investigated the Advanced Auto Parts robbery and discovered a video from a neighboring business that captured the road and an alley outside Advanced Auto Parts. The video shows an orange Pontiac Sunfire driving by Advanced Auto Parts at 10:10 on the morning of the robbery. Fifteen minutes later, the vehicle drives by Advanced Auto Parts again and then parks behind a dumpster, out of view of Advanced Auto Parts. The time and date stamp on the video corresponds with the time and date of the robbery. Rogers stated that he obtained this video from a neighboring business and viewed the original video on a small monitor in the business. The owner of the business then copied the video when Rogers was present. Rogers explained that the video and still photographs introduced at trial were accurate representations of what he originally viewed. Rogers also testified that to his knowledge, the time and date stamp at the bottom of the video and still photographs was true and accurate. Additionally, Roger's

identification of locations of the video camera, the Advanced Auto Part store, and the location of the neighboring business corresponded with the video. Therefore, we find that the trial court did not err in admitting this video and still photographs as the evidence established that the video and the time and date stamp were reliable.

{¶ 71} Thus, the trial court did not err in admitting the state's exhibits. Appellant's fourth assignment of error is overruled.

{¶ 72} Assignment of Error No. 5:

{¶ 73} THE STATE'S EVIDENCE WAS INSUFFICIENT AND AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 74} Appellant argues that his seven robbery convictions were not supported by sufficient evidence and were against the manifest weight of the evidence because the state failed to prove the identity of the masked robber. Appellant contends that the only evidence linking him to each of the robberies was the testimony of Moore who was an unreliable witness because his memory was poor, his testimony was inconsistent with other witnesses, he is schizophrenic, and he was under the influence of heroin and crack-cocaine during the robberies.

{¶ 75} As this court has previously stated, "a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." *State v. Wilson*, 12th Dist. No. CA2006-01-007, 2007-Ohio-2298, ¶ 35. In turn, while a review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct concepts, this court's determination that appellant's conviction was supported by the manifest weight of the evidence will be dispositive of the issue of sufficiency. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 76} A manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.

*State v. Clements*, 12th Dist. No. CA2009-11-277, 2010-Ohio-4801, ¶ 19. A court considering whether a conviction is against the manifest weight of the evidence must review the entire record, weighing the evidence and all reasonable inferences, and consider the credibility of the witnesses. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 39. However, while appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, these issues are matters primarily for the trier of fact since it is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Therefore, the question upon review is whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Good*, 12th Dist. No. CA2007-03-082, 2008-Ohio-4502, ¶ 25.

{¶ 77} To be guilty of robbery in violation of R.C. 2911.02(A)(2), the state was required to prove appellant, "in attempting or committing a theft offense or in fleeing immediately after the attempt or offense," "inflict[ed], attempt[ed] to inflict, or theaten[ed] to inflict physical harm on another." A person commits a theft offense if that person, "with purpose to deprive the owner of property or services," "knowingly obtain[ed] or exert[ed] control over either the property or services," "without consent of the owner or person authorized to give consent." R.C. 2913.02(A)(1); 2913.01(K)(1).

{¶ 78} We will begin by addressing the robberies of the BP Drive-Thru on October 4 and November 12, 2010. Moore testified that he and appellant worked together in robbing the Drive-Thru on both occasions. Appellant chose the Drive-Thru as a good location to rob as he is familiar with the Butler County area and Moore is from Columbus, Ohio. During both robberies, Moore stated that appellant parked his vehicle on a residential side street that was out of view of the Drive-Thru. Moore then robbed the Drive-Thru unmasked, using a fake

plastic gun for both robberies. After Moore completed the robbery, he ran back to the side street where appellant was parked, and the two men quickly drove away. The men spilt the money from the robbery in half. Moore identified himself on a surveillance video from the Drive-Thru recorded on October 4 and November 12, 2010, which shows a man with a fake plastic gun robbing the business. However, a Middletown Detective testified that he investigated these robberies and did not pursue a lead which suggested that a maroon SUV was idling close to the Drive-Thru on one of the nights of the robberies.

{¶ 79} We find that appellant's convictions regarding the robberies of the BP Drive-Thru were not against the manifest weight of the evidence as Moore's testimony and the surveillance video established that the greater inclination of evidence shows appellant was involved in the robbery. Although the detective did not pursue a lead regarding one of the robberies, we do not find this fact alone enough to show that appellant did not commit the robberies. Instead, Moore's testimony and the surveillance video provide enough evidence to convict appellant of these robberies.

{¶ 80} Appellant's next conviction concerned the October 5, 2010 robbery of a Waffle House. A Waffle House manager, customer, and Moore testified regarding the robbery. All three witnesses testified that two men entered the restaurant, one unmasked and one who wore a checkered bandana on his face. Moore explained that appellant was not planning on going in during this robbery but because of the number of people in the restaurant decided to accompany Moore and used a shirt in the back seat of his car to cover his face. The manager and the customer testified that they were afraid for their safety and that the unmasked man was not armed while the masked man had a gun that was silver and appeared real. The customer went on to explain that the gun at first did not appear real because of the size of the weapon. Moore stated that he was not armed during the robbery but that appellant used a fake gun that was black. Moore explained that he and appellant

stole the cash out of the restaurant's cash registers. Like the Drive-Thru robberies, appellant picked the Waffle House as a target and he and appellant split the money from the robbery. Additionally, the manager identified appellant as the masked man, though the manager admitted to investigating appellant and the robbery online before trial.

{¶ 81} We find that appellant's conviction regarding the Waffle House robbery is not against the manifest weight of the evidence. Although the manager admittedly investigated appellant before trial and the victims' testimony regarding the gun was inconsistent with Moore's description, the other evidence established that appellant was involved in this robbery. All three witnesses were consistent regarding the number of robbers, the masked and unmasked individual, and the events which took place during the robbery. Moreover, Moore identified appellant as the masked robber and his description of the robbery was consistent with the manager's and customer's descriptions. Therefore, appellant's conviction is not against the manifest weight.

{¶ 82} The next robbery to occur was of the West Chester Great Clips on October 14, 2010. Both Great Clips employees consistently testified that around 8:40 p.m., an unmasked man entered the salon, asked if they were still open, and then produced a gun and asked for the store's money. One of the employees described the gun used as silver with a long handle. Further, both employees stated that as the robber was leaving the store, one of the employees tried to follow him. However, the employee halted when Moore told her to stop and the other employee told her it was not worth it.

{¶ 83} Moore's testimony was largely consistent with the employees' recitation of the robbery. Though he described the gun used as black, his testimony was consistent in many other ways. Like the employees' testimony, Moore stated that he went into the hair salon, asked if the salon was still open, produced a weapon, and took the money. Additionally, Moore stated that as he was exiting the business, one of the employees followed him but

then stopped after he and the other employee told her to stop. Moore testified that appellant picked the Great Clips to rob, appellant was the getaway driver, and the two men spilt the money from the robbery. Therefore, because of the consistencies in Moore's and the employees' testimony along with Moore's identification of appellant, appellant's conviction is not against the manifest weight of the evidence.

{¶ 84} Appellant's fourth conviction involved the robbery of Dillman's Grocery. The state presented two victims who testified that they were working at the grocery store the night of the robbery and observed two men rob the business. One of the victims was the manager of the store who stated that two men, one wearing a black ski mask and one not wearing a mask, came into the business with guns. The manager described the guns the men were carrying as black pistols. The employee also described the robbery in this manner and both the employee and the manager identified a mask and a fake gun recovered from appellant's vehicle as matching those used in the robbery. During the robbery, the masked man became frustrated with the employee as she was having trouble opening her cash register drawer. Both victims testified that the masked man threatened to shoot the employee in the stomach and another girl in the leg. Neither the manager nor the employee was able to identify the masked robber. The victims stated that the men stole approximately $10,000 from the business.

{¶ 85} Moore testified that both he and appellant went into Dillman's Grocery with fake pistols and took a total of $4,000 from the business. Similar to the victims' testimony, he stated that he did not wear a mask while appellant wore a black ski mask. Moore testified that appellant had "words" with one of the employees and that both men pointed their guns at the employees "pretty much the whole time." Like the other robberies, appellant chose the location and the men divided the money in half. Though Moore's testimony regarding the amount they stole from Dillman's was inconsistent with the victims' testimony, this

discrepancy does not make appellant's convictions against the manifest weight in light of the other evidence presented at trial. Appellant's conviction was supported by Moore's identification of appellant as the masked man, the consistency of Moore's and the victims' testimony, and the victims' identification of the mask and the gun found in appellant's vehicle as similar to those used in the robbery.

{¶ 86} Next, appellant was convicted of robbing Jimmy John's on January 8, 2011. The state presented two witnesses who were working at the restaurant at the time of the robbery. Moore and these witnesses all testified that two men entered the restaurant, one wearing a black ski mask and one unmasked. Moore explained that like the other robberies, he did not wear a mask while appellant wore a black ski mask. The witnesses were unable to identify appellant as one of the robbers. Moore and the witnesses all testified that both men had a gun and that the masked robber was holding the witnesses down with the gun during the robbery. The witnesses explained that during the robbery, the men had a hard time finding the back exit door and had to ask the employees directions on how to leave. Similarly, Moore acknowledged that he and appellant could not find the back door and had to ask for directions. Moore and appellant spilt the money from the robbery. At trial, the state introduced still photographs dated January 8, 2011, from the restaurant's surveillance system and the witnesses stated that these photos depicted the robbers. Moore identified himself and appellant as the robbers in the photos. Consequently, appellant's conviction regarding the Jimmy John's robbery was not against the manifest weight of the evidence.

{¶ 87} Appellant's seventh and final robbery conviction concerned the robbery of Advanced Auto Parts on January 16, 2011. Two Advanced Auto Parts employees testified that an unmasked man entered the business followed by a masked man. Both men were armed. Initially, only one employee was in the front part of the store. Once the second robber entered the business, the second employee came into the front room. After the

second employee entered the room, the masked man placed the gun at the back this employee's head.  The employee stated that he heard a gun cocking sound.  The robbers then proceeded to empty the cash registers but were unable to take the money in the safe.  The employees identified the fake gun and mask recovered from appellant's car as the gun and mask used in the robbery.

{¶ 88} Moore's testimony regarding this robbery was largely consistent with the employees' testimony.  He stated that he entered the business first, followed by appellant who wore a black ski mask.  He and appellant used fake guns and appellant placed the fake gun at the back of one of the employee's head.  Moore stated that the guns were fake and would not be able to make a gun cocking sound.  Moore identified the fake gun and black ski mask recovered from appellant's car as the same gun and mask used in the robbery.  Moore stated that the men took the money in the cash register but were unable to take the money in the safe.

{¶ 89}  A surveillance video obtained from a neighboring business was also introduced at trial.  This video showed an orange Pontiac circling Advanced Auto Parts during the 20 minutes before the robbery.  Moore stated that he rode in appellant's vehicle, an orange Pontiac Sunfire, that appellant was driving to the robbery.  Moore explained that they drove around the business several times before deciding to rob it.  Moore identified the vehicle in the surveillance video as appellant's vehicle.  Appellant's conviction is not against the manifest weight because of the consistencies between the employees' and Moore's testimony, Moore's identification of appellant as being involved in the robbery, and the surveillance video.

{¶ 90} Thus, appellant's seven robbery convictions were supported by sufficient evidence and were not against the manifest weight of the evidence.  Although there were some inconsistencies at trial, "[a] defendant is not entitled to a reversal on manifest weight

grounds simply because there was inconsistent evidence presented at trial." *State v. Jones*, 12th Dist. No. CA2011-05-044, 2012-Ohio-1480, ¶ 28. A jury is in the best position to take into account the witnesses' demeanor and thus to assess their credibility, and therefore is entitled to believe or disbelieve all, part, or none of the testimony of a witness. *Id.* Although Moore is a schizophrenic and used drugs during the robberies, his testimony was consistent with the other witnesses' testimony at trial and identified appellant as being involved in the robberies. Additionally, the surveillance videos and testimony of the victims were evidence to support appellant's convictions.

{¶ 91} Appellant's fifth assignment of error is overruled.

{¶ 92} Assignment of Error No. 6:

{¶ 93} APPELLANT'S CONSTITUTIONAL RIGHT TO COUNSEL WAS PREJUDICED BY THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

{¶ 94} Appellant alleges that he was denied effective assistance of counsel in violation of his constitutional rights. To prevail on an ineffective assistance of counsel claim, appellant must show that counsel's performance fell below an objective standard of reasonableness and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052 (1984). In order to demonstrate prejudice, appellant must establish, but for counsel's errors, a reasonable probability exists that the result of his trial would have been different. *State v. Ritchie*, 12th Dist. No. CA2008-12-304, 2009-Ohio-5280, ¶ 21, citing *Strickland* at 694. The failure to make an adequate showing on either prong is fatal to appellant's ineffective assistance of counsel claim. *State v. Bell*, 12th Dist. No. CA2008-05-044, 2009-Ohio-2335, ¶ 77, citing *Strickland* at 697. Judicial scrutiny of counsel's conduct must be highly deferential. *Strickland* at 689.

{¶ 95} Appellant argues that counsel was ineffective because (1) counsel failed to move to sever each robbery offense into a separate trial and (2) counsel failed to challenge

Moore's competency to testify as a witness. As discussed in the first assignment of error, no plain error existed in joining the offenses because evidence of the joined offenses could have been admitted in separate trials pursuant to Evid.R. 404(B). Additionally, in the third assignment of error, we held that the trial court did not err in failing to voir dire Moore because Moore was a competent witness. Therefore, given the lack of error regarding severance and competency, appellant cannot demonstrate that his trial counsel's performance was deficient or that his counsel's choice in not requesting severance of the robbery offenses and not challenging Moore's competency to testify as a witness prejudiced appellant to the point of depriving him of a fair trial.

{¶ 96} Appellant's sixth assignment of error is overruled.

{¶ 97} Assignment of Error No. 7:

{¶ 98} APPELLANT'S RIGHT TO A FAIR TRIAL WAS PREJUDICED BY CUMULATIVE ERROR.

{¶ 99} In his seventh and final assignment of error, appellant argues that, even if we should determine that the individual assigned errors were harmless, the cumulative impact of these errors resulted in unfair prejudice to appellant.

{¶ 100} "According to the cumulative error doctrine, 'a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the numerous instances of trial court error does not individually constitute a cause for reversal.'" *State v. McClurkin*, 12th Dist. No. CA2007-03-071, 2010-Ohio-1938, ¶ 105, quoting *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). However, appellant has not shown that any errors of law occurred during his trial. Consequently, we fail to see how the absence of prejudicial error can rise to the level of cumulative error. Therefore, appellant was not deprived of a fair trial, and the cumulative error doctrine is inapplicable.

**{¶ 101}** Appellant's seventh assignment of error is overruled.

**{¶ 102}** Judgment affirmed.

HENDRICKSON and PIPER, JJ., concur.