[Cite as *State v. Traylor*, 2016-Ohio-5564.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2015-11-105 |
| | : | O P I N I O N |
| - vs - | | 8/29/2016 |
| | : | |
| ROBERT J. TRAYLOR, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 14CR30590

David P. Fornshell, Warren County Prosecuting Attorney, Kathryn M. Horvath, 500 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Engel & Martin, LLC, Mary K. Martin, 5181 Natorp Blvd., Suite 210, Mason, Ohio 45040, for defendant-appellant

**PIPER, P.J.**

{¶ 1} Defendant-appellant, Robert Traylor, appeals his convictions in the Warren County Court of Common Pleas for felonious assault and endangering children.

{¶ 2} On an evening in October 2014, 9-1-1 dispatch received a call requesting medical assistance for an infant who had injuries to her nose caused by another child. When police and medical help arrived, Kylie Traylor was holding her naked infant daughter, who

was only 13 days old at the time, and was applying wet-wipes to the baby's nose. Kylie told officers that she was washing dishes in the kitchen when her three-year-old son injured the baby.

{¶ 3} Soon thereafter, Robert Traylor came through the house, and Kylie told Traylor that their son had bitten the baby's nose. A deputy on the scene observed Traylor pick up the son and slam him into the couch multiple times for having bitten the child. The deputy then arrested Traylor for domestic violence against the son.[1]

{¶ 4} The baby was taken to Cincinnati Children's Hospital, Liberty Way campus, where her health began to rapidly decline. The baby was pale, had poor tone, was limp, was not breathing well, was lethargic, and hypothermic. As a result of the baby's rapid decline, she was transported to the hospital's main campus for further treatment. Once there, the baby was diagnosed with skull fractures, hypoxic ischemic injury (severe brain injuries), and rib fractures. The injuries were consistent with physical abuse, likely caused by an adult rather than a young child. The doctors indicated that the baby would have permanent brain injuries from her abuse.

{¶ 5} During the investigation into the baby's abuse, detectives interviewed Traylor, who denied doing anything to the baby. Kylie was also interviewed and admitted to snorting a Klonopin pill on the day of the baby's injuries, and she changed her story when she spoke to detectives about what occurred that day. Detectives believed that Kylie was trying to hide what occurred on the day the baby was injured, but that she did not commit the abuse herself. Eventually, Traylor was charged with felonious assault and child endangering.

{¶ 6} Traylor pled not guilty, and after a five-day trial the jury found Traylor guilty of both charges. The matter proceeded to sentencing, and the trial court

---

1. The domestic violence charge is not a part of the current case, and was not argued on appeal.

merged the convictions and sentenced Traylor to eight years in prison. Traylor now appeals his convictions and sentence, raising the following assignments of error. For ease of discussion, we will address Traylor's assignments of error out of order.

{¶ 7} Assignment of Error No. 5:

{¶ 8} THE JURY'S VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 9} Traylor argues in his fifth assignment of error that his convictions were against the manifest weight of the evidence and were not supported by sufficient evidence.

{¶ 10} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. The "relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 11} A manifest weight of the evidence challenge, on the other hand, examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66.

{¶ 12} "While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, these issues are primarily matters for the trier of fact to decide." *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 81. An appellate court, therefore, will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*

{¶ 13} Although the legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different, a "determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 14} Traylor was convicted of child endangering in violation of R.C. 2919.22(B)(1), which provides, "No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age: Abuse the child." Traylor was also convicted of felonious assault in violation of R.C. 2903.11(A)(1), which provides, "No person shall knowingly do either of the following: Cause serious physical harm to another or to another's unborn."

{¶ 15} After reviewing the record, we find that Traylor's convictions were supported by sufficient weight and were not against the manifest weight of the evidence. The state presented testimony from the Warren County deputy sheriff who responded to the scene after Kylie called 9-1-1. The deputy testified that when he arrived, he saw Kylie holding the baby, and that she was applying wet wipes to the baby's nose. The deputy testified that he saw a piece of the baby's nose missing when Kylie moved the baby wipes, and that Kylie told him that her son had injured the baby while she was in the kitchen.

{¶ 16} The deputy also testified that while he spoke to Kylie about the injuries, the son, who had just turned three years old a few days before, was walking and standing near his

- 4 -

mother's legs. At that point, Traylor came into the back porch area from the front of the home, and was "kind of stumbling a little bit with his walking and slurred speech." According to the deputy's testimony, Traylor was "under the influence of something." Kylie told Traylor that their son had injured the baby, and Traylor told the son that if the deputy was not there, he would have killed him. The deputy testified that Traylor held his son down on the couch, yelled in his face, and asked the child "how would you like it if I bit your nose off?" Traylor let the child up from the couch, and continued to pace the room while waiting for paramedics to arrive.

{¶ 17} After paramedics arrived and began assessing the baby, Traylor picked up his son, threw him approximately three feet into the couch, held him down, and yelled at him. The deputy then arrested Traylor for assaulting the child. The deputy testified that he did not observe any blood on Traylor, Kylie, the son, or the baby, but did observe bloody tissues in a garbage can in the house.

{¶ 18} The paramedic, who arrived at the house at approximately 5:27 p.m., testified that upon his arrival, he spoke with Kylie who was holding the baby. The baby was naked, and had a "severe laceration to her nose." The baby's nose was not bleeding significantly, and instead, was seeping. The paramedic testified that he would have expected the nose to be bleeding more profusely if the injury had just occurred as Kylie indicated. The fact that the bleeding was controlled indicated to the paramedic that the injury "happened a little while earlier."

{¶ 19} The paramedic testified to performing an initial check on the baby, and that during this time, Traylor walked into the room. However, Traylor did not come over to check on the baby, and instead, grabbed his son as described in the deputy's testimony. The paramedic described Traylor's demeanor as "agitated and angry," and further testified that at no time did Traylor inquire into the baby's well-being.

{¶ 20} The state presented the testimony of Kylie's father, who testified that he spent time with Traylor, Kylie, and the baby on the day of the incident. Kylie's father testified that when he saw Traylor earlier in the day, he was "lost" and in "left field" after having missed a probation meeting. Kylie's father testified that Traylor expressed fear of having violated the terms of his probation and that he would have to return to jail as a result.[2] Traylor spent his time with Kylie's father "mumbling," "moaning, weeping, half crying." At some point, Traylor and his father-in-law picked up Kylie's younger sister from school, and the three returned to Kylie and Traylor's home. There, Kylie's father observed the baby, and saw that she did not have any marks, scars, cuts, or bruises on her. Kylie's father testified that at approximately 4:00 p.m. on the day of the incident, the baby appeared healthy, had a bottle, and did not appear uncomfortable or fussy.

{¶ 21} Kylie's father further testified that he heard Kylie and Traylor arguing in the bathroom, and that when Kylie exited the bathroom, she removed her wedding ring and then laid down on the couch. Traylor then began speaking to himself about his time in Afghanistan --- however, Traylor had never served in the military.

{¶ 22} An intake worker for Warren County Children Services testified that he received a referral that the baby had tested positive for marijuana at birth, and that as a result, he contacted Kylie to schedule a home visit. The worker testified that the home visit occurred the same day that the baby was injured, but when he saw the baby earlier that day, she had no marks, scars, cuts, or bruises and she took a bottle without trouble. The worker also testified that the baby was not fussy, was not crying, and was "very typical for a newborn." The worker later testified that he spoke with Kylie about her drug use, and they spoke about Traylor and concerns Kylie expressed "for him as far as some of his anger management,

2. Traylor's probation officer later testified that as a result of his missing his appointment, Traylor knew he could face three days in jail.

some of his temper tantrums, flying off the handle * * *."

{¶ 23} The state next presented testimony from a doctor who treated the baby at the emergency room. The doctor testified that when he approached the baby, he noticed that "there was really no nose," and that the baby had very poor tone, she was very pale, she was very limp, and that the baby was a "very ill child and needed to be further resuscitated." Upon further examination, the baby was lethargic, showing signs of shock, and was not breathing normally. The baby was also hypothermic and was not crying properly.

{¶ 24} The doctor testified that he and his team resuscitated the baby, and focused then on transporting her to the main campus of the hospital for further diagnosis and treatment. The doctor testified that his initial concern was that the baby had suffered significant traumatic injuries, and that he had trouble believing that the baby's brother could have caused the injuries.

{¶ 25} The state then called a pediatric neuroradiologist who specializes in working with brains and spines of pediatric patients. The doctor testified that she works with the child protection team and trauma team, which meets once a week to review physical abuse cases that come into the hospital. The doctor testified that the baby had "pretty significant skull fractures," "multiple areas of bleeding surrounding the brain," and "pretty significant brain injury." The baby's brain was also swelling inside her skull, and she had to have life-saving surgery.

{¶ 26} Based on the baby's severe injuries, the doctor concluded that the child's injuries were not caused from a short distance fall or similar accident such as rolling off of the couch. Instead, the doctor testified that the baby's injuries were more in line with those suffered from a high-speed car accident. The doctor testified that the injuries had occurred on the day of the incident, and were not older injuries that had possibly occurred days before. The doctor concluded that the child's injuries were so severe that they caused permanent

brain injury and that the baby "will not be a normal child."

{¶ 27} Regarding other injuries, the doctor testified that the baby's ribs were broken, and that one such broken rib was in a high position that is usually protected. The doctor testified that the broken rib in a protected area is not a common place for an injury, and that such bone breaks occur in "abusive settings." In total, the baby had three confirmed and one possible broken ribs on the left side and one confirmed and one possible broken rib on the right side. The doctor testified that rib injuries of this type were not typical of accidental injuries, and that three breaks in a row indicates a "traumatic cause."

{¶ 28} The doctor also testified that there was blood in the baby's spinal cord, which is also an uncommon finding in an accidental injury. The doctor testified that blood in a baby's spinal cord is indicative of "significant trauma," "child abuse," or trauma similar to a car accident. However, the blood's existence in the spinal cord is not expected in a short distance fall. Nor were the injuries consistent with a young child throwing a toy at the baby or the baby falling out of her bassinette. The doctor concluded that the injuries were consistent with what would occur if the baby was thrown against a hard surface, and there was traumatic impact, rather than simply being shaken.

{¶ 29} The doctor also testified that the injuries were not consistent with anything that a three-year-old child would be able to inflict, but instead, were consistent with an adult picking up the baby, shaking her, and slamming her against something. When pressed further on cross-examination as to whether the three-year-old brother could have inflicted the injuries, the doctor testified,

> most three-year-olds would have difficulty in causing all the injuries. This child had significant chest trauma and head trauma. And so I guess when we discuss it, we look at what a typical three-year-old child is capable of doing. And most three-year-olds are not able to inflict the amount of injury that this child had inflicted.

On re-direct, the state asked the doctor if it was probable that the three-year-old child, who weighed 27 pounds at the time of the incident, could inflict the baby's injury, and the doctor answered "no."

{¶ 30} The state also presented the testimony of another pediatrician, who also specialized in child abuse. The doctor testified that as part of her practice, she is often asked to determine whether injuries are caused by either accidental injury or medical conditions that mimic child abuse or the injuries are caused by child abuse. The doctor testified that nothing in the baby's medical or social history explained her injuries, and that such injuries were more in line with being ejected from a car and going through glass.

{¶ 31} The doctor further testified that in her 18 years of experience, no three-year-old child had ever inflicted similar type injuries on another child, and that in her estimation, "a three-year-old would not be able to cause this degree of bony [sic] and head injury." The doctor testified that a three-year-old could not have caused the injuries the baby suffered because of the degree of force needed to cause fractures in a child's rib area, and that such force would be "out of the range that a three-year-old has the capacity to do to a child."

{¶ 32} Further, and specific to the head injuries, the doctor concluded that the force necessary to cause the head injuries would also be "outside of the range" that a three-year-old child could inflict. When asked if it would change her mind if the three-year-old was aggressive and displayed sibling rivalry toward the victim, the doctor responded, "I don't care if there's an aggressive three-year-old in the home, that aggressive three-year-old would not have caused these injuries." Instead, the doctor testified that the injuries were more in line with an adult shaking the baby and slamming her against something.

{¶ 33} The state then presented testimony from a man who was in the same jail with Traylor. The two men had become friends in the year prior to the baby's injuries, and were later coincidentally incarcerated at the same jail once Traylor was arrested for domestic

violence against his son and the friend violated the terms of his probation. Traylor's friend testified that Traylor told him that on the day of the incident, Traylor and Kylie had been fighting about who had fathered the baby.[3] Traylor told Kylie that he believed Kylie's step-father fathered the baby and that he did not want anything to do with the baby. Traylor told his friend that on the day of the incident, he dropped the baby and that the baby "ended up getting its nose cut off."

{¶ 34} The friend further testified that Traylor told him that during the argument, and before the baby's nose was cut, Traylor punched the baby while trying to punch Kylie and that after the baby fell to the ground, he called the baby a "piece of shit" and later stated that he did not "give a fuck, * * * this ain't my kid * * * I'll end its life right now." Traylor also told his friend that he cut the baby's nose off because she would not stop crying. Traylor's friend testified that he was not receiving anything from the state in return for his testimony, such as a reduced sentence for his probation violation.

{¶ 35} The state also called a forensic dentist, who testified that he specializes in bite mark evidence and other areas where dentistry and the law overlap. The dentist testified that Traylor's defense team contacted him regarding evidence in the case against Traylor. The dentist was provided with photographs of the baby's nose injury, and was asked to determine whether the baby's nose injuries were caused by a human bite.

{¶ 36} The dentist testified that he determined, within a reasonable degree of medical and dental certainty, that the baby's nose injuries were not caused by a human bite. Instead, the dentist testified that the injuries had a "smooth delineation" and were not jagged or did not have borders to represent teeth marks. The dentist concluded that "the border where the

---

3. This aspect of the friend's testimony was corroborated later when the jury heard a taped phone call between Traylor and his father in which Traylor indicated that he asked for a DNA test from the court in order to find out if the baby was his. The DNA test performed on the children, as ordered by the court, determined that both children were fathered by Traylor.

damaged and undamaged tissue is very smooth meaning that some sort of an object with an edge probably cutting it as opposed to biting it off." When asked whether a knife could cause the type of injury seen in the photographs, the dentist answered "I would believe so, yes."

{¶ 37} The state also presented the testimony of a detective who investigated the matter. The detective testified that before the police had suspected that a knife was involved, Kylie brought a knife and a jacket belonging to Traylor to the police station, and told the detective that there was blood on both. At that point in time, the police were still considering the injuries as being caused by a bite. While laboratory testing indicated that no blood was found on the knife or the jacket, the detective nonetheless confirmed that without asking, Kylie brought a specific knife to the police station and that there was no way of knowing if the knife had been previously wiped or cleaned.

{¶ 38} The detective also addressed reasons why Kylie was not a suspect in the case, and explained that the investigation was focused on Traylor for various reasons. The detective testified that Traylor told lies during his interview, and that she heard various statements from those she interviewed that Traylor was a "violent rageful [sic] man."[4]

{¶ 39} Traylor's father testified on cross-examination that Traylor has anger issues, and that he had observed Traylor get so angry that Traylor almost blacked out. Traylor's father also testified that Traylor takes medication and that Traylor's anger issues are impacted by whether or not he is taking his medication properly. Traylor's father also testified that he was concerned that Traylor was not taking his medication at the time of the baby's injuries.

{¶ 40} Traylor's father also testified on cross-examination that he spoke to Traylor on

---

4. The jury was shown the initial interview between the detective and Traylor. During the latter part of the interview, Traylor became angry and confrontational with the detective, and the jury was able to observe Traylor's demeanor when questioned about his involvement in the baby's injuries.

the day of the incident and that Traylor was agitated and upset about the possibility of going to jail for having missed his probation appointment. Traylor's father admitted to having concerns about his son, and specifically, that Traylor was not taking his medication.

{¶ 41} In his own defense, Traylor called a medical expert who disagreed with some findings of the pediatricians who provided care for the baby. Traylor's expert contended that some of the rib fractures were not actual fractures, and also indicated his belief that a three-year-old child could possibly cause injuries similar to those inflicted upon the baby. Traylor also called several witnesses who testified that his son was aggressive toward others, and exhibited signs of aggression and angry toward the baby in particular.

{¶ 42} However, the jury's verdict demonstrates that it found the testimony of the state's witnesses more credible and gave more weight to the state's evidence than that offered by Traylor. "Upon acknowledging that such extensive testimony will inevitably produce some inconsistent or conflicting assertions, we recognize the sound [principle] that the trier of fact is best positioned to weigh the credibility of the individual witness and reach a conclusion based on the totality of the evidence." *State v. Hernandez,* 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 41.

{¶ 43} After a full review of the record, we find that Traylor's convictions were supported by sufficient evidence because when viewed in a light most favorable to the prosecution, the state offered evidence to prove that Traylor feloniously assaulted and endangered his daughter. We also find that the jury did not clearly lose its way or create a manifest miscarriage of justice so that a new trial must be ordered. As such, Traylor's convictions were not rendered against the manifest weight of the evidence. Traylor's fifth assignment of error is therefore overruled.

{¶ 44} Assignment of Error No. 1:

{¶ 45} THE TRIAL COURT ERRED IN ADMITTING LETTERS ALLEGED TO HAVE

BEEN WRITTEN BY APPELLANT.

{¶ 46} Traylor argues in his first assignment of error that the trial court erred by admitting letters into evidence, alleged to have been written by himself, without proper authentication.

{¶ 47} An appellate court will not reverse a trial court's decision regarding the admission of evidence absent an abuse of discretion. *State v. Lamb*, 12th Dist. Butler Nos. CA2002-07-171 and CA2002-08-192, 2003-Ohio-3870, ¶ 59. An abuse of discretion is more than an error of law or judgment, and instead implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Thompson*, 12th Dist. Warren No. CA2015-09-083, 2016-Ohio-2895, ¶ 8.

{¶ 48} "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by introducing evidence sufficient to support a finding that the matter in question is what its proponent claims." *State v. Freeze*, 12th Dist. Butler No. CA2011-11-209, 2012-Ohio-5840, ¶ 65. According to Evid.R. 901(B),

> the following are examples of authentication or identification conforming with the requirements of this rule:
>
> (1) *Testimony of Witness With Knowledge.* Testimony that a matter is what it is claimed to be.
>
> (2) *Nonexpert Opinion on Handwriting.* Nonexpert opinion as to the genuineness of handwriting, based upon familiarity not acquired for purposes of the litigation.
>
> (3) *Comparison by Trier or Expert Witness.* Comparison by the trier of fact or by expert witness with specimens which have been authenticated.
>
> (4) *Distinctive Characteristics and the Like.* Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.

{¶ 49} An accused has a constitutional guarantee to a trial free from prejudicial error, not necessarily one free of all error. *State v. Swartsell*, 12th Dist. Butler No. CA2002-06-151, 2003-Ohio-4450, ¶ 31. Pursuant to Crim.R. 52(A), any error, defect, irregularity or variance that does not affect the accused's substantial rights shall be disregarded as harmless error. *State v. McCausland*, 12th Dist. Butler No. CA2007-10-254, 2008-Ohio-5660, ¶ 25. "A finding of harmless error is appropriate where there is overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction." *State v. Wainscott*, 12th Dist. Butler No. CA2015-07-056, 2016-Ohio-1153, ¶ 23.

{¶ 50} During the state's case-in-chief, it offered several letters that were allegedly written by Traylor to Kylie. Kylie gave some of the letters to a social worker, and Traylor's parents gave other letters to a different social worker. The second set of letters were addressed to Traylor's parents' address, but were intended for Kylie. The state called the two social workers to testify, and both testified to receiving the letters from either Traylor or from Kylie's parents. However, neither witness was familiar with Traylor's handwriting or any idiosyncrasies attributable to Traylor that could have otherwise authenticated the letters.

{¶ 51} The state argued that the letters had distinctive characteristics, including reference to the children as "sis" and "bub." However, and as pointed out by the defense during the cross-examination of one social worker, those terms are commonly used to refer to children. The state also argued that the letters were addressed to either Kylie or Traylor's parents, and the return address listed Traylor as the sender. However, there is nothing distinctive about the recipient or sender, and there was no testimony that the addressing of the envelope was in Traylor's handwriting. Nor was there an indication on the envelopes that they were processed through the jail. On some of the envelopes, a post office box is given as the return address, while on others, a different address is given.

{¶ 52} Again, the witnesses who testified about the letters were not able to state that they had any independent basis for knowing the letters came from Traylor, other than what the recipients told them. The state did not attempt to verify that the letters were written in Traylor's handwriting by calling a handwriting expert or anyone familiar with Traylor's handwriting, nor did the state prove that any distinctive characteristics or content of the letters were uniquely attributable to Traylor. For example, while some of the letters were addressed to Kylie as "baby" or "my one and troue [sic] love," there was no testimony to establish that this was Traylor's unique way of addressing Kylie.

{¶ 53} However, and after fully reviewing the record, we find despite the lack of proper authentication, Traylor suffered no prejudicial impact from admission of the letters. Traylor argues that he was prejudiced because in closing arguments the state indicated that Traylor used the letters to apologize to Kylie for his actions. While it is true that in some of the letters Traylor apologizes for his actions, the letters never state the particular actions for which Traylor is apologizing. While the state suggested to the jury that Traylor was apologizing for assaulting the baby, the letters do not directly support such an assertion.

{¶ 54} There is no indication in the letters that any of Traylor's statements were specific to what happened to the baby. In fact, at the time Traylor allegedly wrote some of the letters, he was incarcerated for the domestic violence charge because of what he did to his son on the night of the incident. The letters continually reference court dates for Traylor's domestic violence charge, and mention a hope to leave jail once the domestic violence charge is addressed. An equally reasonable assertion would be that Traylor was apologizing for his actions against his son, which were not in dispute or contested during the trial. At no time, however, did Traylor apologize for, admit, or acknowledge anything that happened specifically to the baby.

{¶ 55} Moreover, the letters contain mostly exculpatory statements, saying he did not

do anything, or that anything that happened was an accident, and that he loved his children very much. In almost every letter, Traylor expresses his love for his children, including that he was "worryed about are babys [sic]," "tell bubby and sissy that Daddy loves them," and "I love you [Kylie] and are kids more then anything in the world [sic]." In one letter, for example, Traylor outright denies having done anything wrong, including his comment to Kylie, "I pray that you no that I did not do what they are trying to say I did [sic]." In another, he told Kylie that both she and he needed to work "on the problms we have in are life and we both have some [sic]." One of the main aspects of Traylor's defense was that someone other than himself committed the acts, whether it was his son or his wife. As such, the comments in the letter suggesting that Kylie had problems actually aided the defense in the many ways it suggested that Kylie had drug problems and parenting deficiencies.

{¶ 56} After reviewing the letters, we find that despite not being properly authenticated, the letters had no prejudicial impact on Traylor's defense. The jury was given the opportunity to hear that Traylor loved his family very much, was anguished from being apart from them, and that he believed Kylie and he both had troubles to work through. Traylor maintained his innocence, and apologies made in the letters could have been specific to his actions toward his son, not the baby. The content of the letters arguably aided the defense as much as they arguably aided the state, therefore, we find no substantial rights affected particularly in view of the overwhelming evidence of guilt. The record clearly indicates that the jury considered all of the evidence establishing Traylor's guilt beyond a reasonable doubt, including the testimony of the man to whom Traylor made significant incriminating statements. As such, the admission of the letters as error constituted harmless error. Traylor's first assignment of error is therefore overruled.

{¶ 57} Assignment of Error No. 2:

{¶ 58} DEFENDANT'S CONVICTION[S] SHOULD BE REVERSED DUE TO

PROSECUTORIAL MISCONDUCT.

**{¶ 59}** Traylor argues in his second assignment of error that the prosecutor committed misconduct by not informing him that the state had contact with a witness who did not honor her subpoena.

**{¶ 60}** For a conviction to be reversed on the basis of prosecutorial misconduct, a defendant must prove the prosecutor's acts were improper and that they prejudicially affected the defendant's substantial rights. *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, ¶ 62. The focus of "an inquiry into allegations of prosecutorial misconduct is upon the fairness of the trial, not upon culpability of the prosecutor." *State v. Gray*, 12th Dist. Butler No. CA2011-09-176, 2012-Ohio-4769, ¶ 57. As such, prosecutorial misconduct "is not grounds for error unless the defendant has been denied a fair trial." *State v. Olvera-Guillen*, 12th Dist. Butler No. CA2007-05-118, 2008-Ohio-5416, ¶ 27.

**{¶ 61}** Traylor argues that the prosecutor committed misconduct by not informing him that the state spoke to one of his witnesses, a social worker who observed visits between Kylie and her two children, and who did not honor her subpoena. The social worker, who was no longer employed by Warren County Children Services, ultimately expressed her belief that because she was no longer employed by the agency, she did not have to honor the subpoena. During a discussion between Traylor, the trial court, and the state, Traylor proffered what the social worker's testimony would have been. The state then proffered what the social worker's testimony on cross-examination would be.

**{¶ 62}** The state indicated that a week before trial started, the state contacted the witness and spoke to her about her interactions with the three-year-old child. However, there is no indication in the record that the state knew that the witness was not going to honor her subpoena, or that it had any information that Traylor did not have or could not have found out through a similar phone call in the week before trial started.

{¶ 63} The trial court noted, and we agree, that Traylor could have made a phone call to prepare for trial, in the same manner that the state did, in regard to its witnesses and to ensure that they were still employed and were prepared to appear at trial. The court also noted that the state did not have an obligation to inform Traylor about the state's trial preparation.

{¶ 64} After reviewing the record, we find that nothing in the prosecutor's actions constitute misconduct, and no actions taken by the state denied Traylor a fair trial. As such, Traylor's second assignment of error is overruled.

{¶ 65} Assignment of Error No. 3:

{¶ 66} THE COURT ERRED IN DENYING THE DEFENDANT COMPULSORY PROCESS OF WITNESSES.

{¶ 67} Traylor argues in his third assignment of error that the trial court erred by not enforcing a served subpoena on the social worker.

{¶ 68} Both the Sixth Amendment to the United States Constitution, and Section 10, Article I of the Ohio Constitution, guarantee a criminal defendant the right to present witnesses on his behalf, and if necessary, allow the defendant to use the power of the court to compel the attendance of those witnesses. *State v. Brown*, 64 Ohio St.3d 649 (1992). Crim.R. 17(D) states in relevant part that "[s]ervice of a subpoena upon a person named therein shall be made by delivering a copy thereof to such person or by reading it to him in person or by leaving it at his usual place of residence * * *." R.C. 2317.21 states in relevant part,

> [w]hen a witness * * * fails to obey a subpoena personally served, the court or officer, before whom his attendance is required, may issue to the sheriff or a constable of the county, a writ of attachment, commanding him to arrest and bring the person named in the writ before such court or officer at the time and place the writ fixes, to give his testimony and answer for the contempt.

- 18 -

{¶ 69} Although Crim.R. 17(G) allows for a finding of contempt against any witness who fails to obey a subpoena, no part of the rule provides for the issuance of a material witness warrant. Instead, R.C. 2317.21 permits a trial court to issue a warrant, but the issuance of a warrant pursuant to that statute is permissible only when the witness has been "personally served." *State v. Kvasne*, 169 Ohio App.3d 167, 2006-Ohio-5235, ¶ 40 (8th Dist.); *State v. Fairman*, 2d Dist. Montgomery No. 24299, 2011-Ohio-6489, ¶ 13.

{¶ 70} The record clearly indicates that the social worker was not personally served. Instead, the record demonstrates that Traylor issued a subpoena, which was served upon the social worker at her place of employment – the child service agency. An agency supervisor signed for the subpoenas according to the agency's normal course. However, there was no personal service made upon the social worker in question.

{¶ 71} Moreover, there is no indication that the social worker, even if personally served, was a material witness in regard to the impact her testimony would have had. The record indicates, through a proffer offered by the defense of what the social worker's testimony would have been, that the social worker would have addressed the way in which the three-year-old child acted toward the baby and his mother when he was observed at supervised visitation. Specifically, the social worker made notations that when she observed visitation, the child threw toys around the baby and his mother. However, the testimony that the child showed aggression toward others was cumulative to other testimony offered.

{¶ 72} For example, Traylor presented testimony of the child's counselor who testified that the child had sibling rivalry issues, was placed in a foster home with no other children, and that during therapeutic play, the child hit a figurine of a baby with a hammer. The jury also heard testimony from the foster parent who first took care of the boy after he was placed in foster care. The foster parent testified that the boy smashed pictures in a closet and also

would not let a younger child out of a closet where the two children were playing. The foster parent also testified that the boy threatened to choke a younger child in the foster parent's care and that the boy put the younger child on the floor and got on top of her for a few seconds until the foster parent told the boy to go to his room.

{¶ 73} The record indicates that the jury was well-aware of the fact that the child had anger issues, engaged himself in sibling rivalry, and displayed aggression toward others. However, there is no indication that the testimony of another social worker would have added new or additional information as to the child's interactions with his sister or mother. In fact, the state also proffered what the social worker's testimony would have been on cross-examination, and she would have testified that the child's aggressive behavior was directed toward his mother, not the baby, and that the social worker never felt that the baby was at risk of harm from her brother.

{¶ 74} Moreover, the record indicates that Kylie, herself, could have testified to what occurred during her visits with the children. While the record indicates that Kylie was subpoenaed by both parties, neither decided to call her as a witness. When the trial court addressed the possibility of calling Kylie to testify to the child throwing toys at the baby, the defense declined the opportunity and rested. As such, there is no indication that the social worker was a material witness or even that she was necessary to address possible aggression issues the boy had toward his sister. Traylor's third assignment of error is therefore overruled.

{¶ 75} Assignment of Error No. 4:

{¶ 76} THE DEFENDANT WAS NOT AFFORDED EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 77} Traylor argues in his fourth assignment of error that his counsel was ineffective for failing to secure the social worker's attendance at trial.

**{¶ 78}** The United States Supreme Court established a two-part test in regard to ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). That test requires an appellant to establish that first, "his trial counsel's performance was deficient; and second, that the deficient performance prejudiced the defense to the point of depriving the appellant of a fair trial." *State v. Myers*, 12th Dist. Fayette No. CA2005-12-035, 2007-Ohio-915, ¶ 33. Regarding the first prong, an appellant must show that his counsel's representation "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The second prong requires the appellant to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

**{¶ 79}** For the same reasons stated above in regard to why the social worker was not a material witness, we find that Traylor is unable to show that but for his counsel not securing the social worker's testimony, the results of his trial would have been different. The jury was well-aware of the issues with the child and how he acted toward his baby sister. However, the jury was equally aware of the evidence presented that the baby's nose injuries were not caused by a human bite, as well as the evidence that a three-year-old child could not have caused the severe and forceful injuries the baby suffered.

**{¶ 80}** Additionally, the record is replete with the many ways the defense and trial court attempted to compel the witness' appearance. The defense tried several times during the second-to-last day of the trial to contact the witness, including obtaining her personnel file from the child service agency to determine a way to contact the witness. The trial court also aided the defense by having the sheriff's office try the night before the last day of the trial to secure the witness' attendance. The witness, who had moved to Kentucky, stated that she would not be coming to trial given that she was no longer employed with the agency. Despite defense counsel moving for a continuance to make further attempts to locate the witness, the

trial court denied the request. Having determined the witness' testimony would have been duplicative, added little substance, and possessed minimal importance in light of all of the other testimony, we do not find counsel's performance was deficient or that it prejudiced Traylor to the point of denying him a fair trial.

{¶ 81} As such, Traylor's fourth assignment of error is overruled.

{¶ 82} Judgment affirmed.

S. POWELL and HENDRICKSON, JJ., concur.